In re the Marriage of Berneita Jean JOHNSON, by Charles L. BURNS, her Guardian and Conservator, Petitioner–Respondent,

v.

Elmer Eugene JOHNSON, Respondent–Appellant.

No. 16651.

Missouri Court of Appeals, Southern District, Division Two.

June 27, 1991.

---

Philip J. Morgan, Ronald K. Carpenter, Phillips, McElyea, Walker & Carpenter, P.C., Camdenton, for respondent-appellant.

Mary Adele Greer, Laurie, for petitioner-respondent.

HOGAN, Judge.

In this case the Circuit Court of Camden County has entered a decree of legal separation and has undertaken to classify the parties' separate and marital property. It has further been ordered that the parties sell the marital property within eight months of the entry of the decree. The case raises a number of questions, but inasmuch as we have concluded the judgment must be reversed, we take up and consider the single point essential and necessary to an orderly disposition of the appeal.

Petitioner Berneita Jean Johnson, to whom we shall refer as the plaintiff, married Elmer Eugene Johnson, to whom we shall refer as the defendant, on October 23, 1971. The marriage was a second marriage for the plaintiff; we are not sure whether the defendant had previously been married. The record evidence of the parties' assets at the time they were married is not clear, but it is fairly inferable that the plaintiff had assets worth several hundred thousand dollars, while the defen-dant's assets at the time of his marriage were worth less than one hundred thousand dollars. We have been handicapped in reviewing the case because the defendant has seen fit to file only two of the fifty-nine exhibits received by the trial court. We are assured by counsel for the defendant that plaintiff's conservatorship, or guardianship, account had nearly $600,-000 in assets in 1984, but we are unable to ascertain from the record presented the precise amount which represents the plaintiff's sole property. All we can say with assurance is that the plaintiff's separate estate is several times the value of the defendant's separate estate.

In 1981—according to the defendant the Spring of 1981—it was discovered that the plaintiff had a brain tumor. Plaintiff was hospitalized and surgery was performed. The plaintiff received radiation treatment after the surgery. Initially, the plaintiff improved, but early in 1983 she developed alarming symptoms which included gross edema; as the defendant described his wife's ailment, "[s]he had fluid on her system and we [didn't] want that to get into her lungs." Plaintiff's condition deteriorated, and consultation with physicians at the Mayo Clinic indicated that the plaintiff would need full-time custodial care. She entered a nursing home in May 1984 and has remained there since that time.

On May 25, 1984, the defendant filed a pleading in the Probate Division of the Circuit Court of Camden County requesting, according to that court's docket sheet, the appointment of a guardian and conservator for the plaintiff. The plaintiff's adult son, Charles L. Burns—referred to in this record as Chuck—also filed a pleading in the Probate Division, and on June 7, 1984 a hearing was held. Findings of fact and conclusions of law were filed, although they are not before this court. The letters issued are not before this court, but for the purposes of this appeal we shall assume that Chuck was appointed his mother's guardian [1] and conservator.[2] The plain-

---

1. Defined by § 475.010(5), RSMo 1986, as "one appointed by a court to have the care and custody of the person of a minor or of an incapacitated person...."

2. Defined by § 475.010(3) as "... a person or corporation appointed by a court to have the care and custody of the estate of a minor or a disabled person...."

tiff's estate was not inventoried for some time, although testimony given by the guardian and conservator indicates that the total value of the plaintiff's estate was "about" $590,000 to $595,000 in April 1988. This figure may, however, include assets which would properly be classified as marital property in a dissolution proceeding. The defendant's testimony indicated at one point that his "net worth," aside from property which could be considered marital property, was about $30,000.

Plaintiff's guardian and conservator testified that his mother's condition had not changed very much since she became incapacitated in 1984, and in his opinion she was wholly unable to care for herself. Chuck could not carry on a conversation with his mother because she could not retain what he had told her. Nevertheless, an attendant who worked at the nursing home testified that the plaintiff keeps a log of her daily activity. This witness also testified that the plaintiff had difficulty keeping track of things and the witness "didn't think" the plaintiff would be able to manage her own affairs. The defendant expected the plaintiff to improve and to return to the family home; plaintiff's guardian could "foresee" another 20 to 30 years in the nursing home. The record before us contains no medical testimony of any order. Although the cryptic lay opinions expressed by the defendant, the guardian and the nursing home attendant were received without objection, we are unable to ascertain the nature of the plaintiff's illness or her prospect of recovery as might be anticipated from the usual course of her disease. We do not know the extent of her powers of cognition.

That part of the probate record filed in this court—its docket sheet—indicates that a good many claims were filed against the plaintiff's estate. The plaintiff's liquid assets had been depleted at trial time. Care at the nursing home is expensive. Plaintiff's guardian testified that the institution's monthly charge was about $1,400. One of the exhibits introduced in evidence,

which is not before this court, indicated that during the time the plaintiff had been in the nursing home her medical expenses, including an unpaid account with the nursing home, came to more than $75,000.

When the parties were married, they executed an antenuptial agreement. This document provides, among other things, that during their joint lives each party shall have the full power of disposition over his or her property as if he or she were single and unmarried, "and the other expressly assents thereto." It appears that the language just quoted has been taken to require the defendant's written consent whenever any of the plaintiff's separate property is sold. Perhaps inevitably, the guardian and the defendant have disagreed concerning the assets which should be used to pay the plaintiff's continuing expenses. At trial time, the defendant had not paid any of the plaintiff's expenses for medical or custodial care. According to the plaintiff's guardian, the defendant has refused to cooperate in selecting assets to be sold. It is unnecessary to restate the details of the difficulties which have developed between the plaintiff's guardian and the defendant. The guardian initiated this action as a means of determining the nature and extent of his ward's estate and to facilitate the sale of her assets without interference from the defendant. With permission of the Probate Division, the guardian and conservator filed this action for dissolution. After trial the court entered an order, a part of which reads:

"The court finds that the parties acquired marital property as described in Petitioner's Exhibits 5, 6, 7 and 8 and that given the nature of the Property and the situation of the Parties it is impossible to divide and therefore the Court orders that the property be divided 50% to each party and that the property is to be sold and the proceeds equally divided after payment for cost of sales. The court recognizes that sale may involve some time given the nature of the

References to statutes are to RSMo 1986, except where otherwise noted. References to rules are to Missouri Rules of Court (19th ed. 1988), except where otherwise specifically noted.

property and therefore orders that the parties shall have 8 months to sell the marital Property.

Parties further shall be entitled to ½ of the net income from the operation of the business and rentals generated from the Marital Real Estate."

It was further ordered that the nonmarital property as stipulated by the parties be set apart to the plaintiff and the defendant.

In this court, the defendant husband has briefed and argued two assignments of error. His first point, slightly paraphrased, is that the court erred in granting a decree of legal separation because the guardian did not have the ability to bring an action for dissolution of the marriage and the ward neither verified the petition nor expressed her intent to dissolve the marriage. His second point is that there was no evidentiary basis for a finding that the marriage was irretrievably broken. We find the second point meritorious and consider it unnecessary to discuss the first.

We realize that the appeal raises many complex, tangential questions. Some of these questions were addressed by this court in *Hulse v. Warren,* 777 S.W.2d 319 (Mo.App.1989). Others have not been addressed by our courts but need not be discussed in order to dispose of this appeal on its merits. A close examination of the whole record strongly suggests that the action was initiated so the parties' marital and nonmarital property could be identified and apportioned, but there is no record proof of the need for such an action, even assuming that the last sentence of § 475.-091(2) [3] authorizes conservators to initiate actions for legal separation or dissolution of marriage. There is some indication in the record that the plaintiff is being treated with radiation; this suggests she may have cancer and her illness may be of short duration. The defendant testified that he expects his spouse to improve and return home. Whether the plaintiff will require treatment for a long period of time or has only a short life expectancy is, upon the

record before us, speculative. It is conceded that the plaintiff brought a good deal of her separate property into the marriage, and as this court held in *Hulse v. Warren,* 777 S.W.2d at 322:

"[2] The doctrine of necessaries should apply to both spouses but where the spouses have separate assets the spouse receiving the necessaries would have the primary responsibility or liability. When the claim is by others each spouse would have a secondary obligation for the necessaries of the other with the primary obligation on the party incurring the expense or for whose care it was incurred...."

■ Our point, stated somewhat repetitively, is this: Granting that § 475.091(2) authorizes the Probate Division to approve a conservator's prosecution of an action for separate maintenance or for dissolution of a marriage, that statute does not authorize the prosecution of such an action simply because it may serve the interest of the conservator to determine what property belongs to each spouse. No need to dispose of property which might be considered marital property is demonstrated, considering the fact that the plaintiff's separate property, which is primarily subject to the nursing home's claim for necessaries, *Hulse v. Warren,* 777 S.W.2d at 322, is ample for that purpose. Further, the decree entered indicates it is almost impossible to determine the source of the funds expended to acquire the property which appears to be marital property. See generally, *Hoffmann v. Hoffmann,* 676 S.W.2d 817 (Mo. banc 1984). To reiterate, this action was brought to make it more convenient for the guardian and curator to decide which asset to sell or encumber in order to care for his ward. We find no precedent for such action.

■ Turning rather abruptly to the merits of the appeal, we bear in mind that the scope of our review is determined by Rule

---

**3.** Which, in pertinent part, reads: "... [the power of the Probate Court] includes the power to make, ratify and undertake proceedings for, and agreements incident to, dissolution of the marriage of the protectee, and transactions involving conflicts of interest between conservator and protectee."

73.01(c) and *Murphy v. Carron*, 536 S.W.2d 30, 32[1-3] (Mo. banc 1976). Our review of the entire record convinces us that the trial court erroneously applied the law.

In 1973, the General Assembly adopted part of the 1970 version of the Uniform Marriage and Divorce Act. Laws of Mo. 1973, p. 470. The Missouri act has been amended several times.[4] The plaintiff's amended petition, upon which the cause was tried, contained an averment that the marriage of the parties was irretrievably broken and prayed such finding and entry of a decree of legal separation. The defendant, in his verified answer, denied that the marriage was irretrievably broken and denied the authority of the trial court to enter a decree of dissolution. This is not a case in which both parties admitted the marriage was irretrievably broken, and we take it that the principles of statutory construction applied in *Colabianchi v. Colabianchi*, 646 S.W.2d 61 (Mo. banc 1983), and further discussed by this court in *McCallister v. McCallister*, 809 S.W.2d 423 (1991), did not *require* the entry of a decree of dissolution. So, we apply the rule that when one of the parties has denied that the marriage is irretrievably broken the petitioner must satisfy the court of the existence of one or more of the five conditions enumerated in § 452.320.2. *Tygett v. Tygett*, 639 S.W.2d 282, 284 (Mo.App.1982); *J.A.A. v. A.D.A.*, 581 S.W.2d 889, 893[1, 2] (Mo.App.1979); *C.B.H. v. R.N.H.*, 571 S.W.2d 449, 452-53[2] (Mo.App.1978). The statute, § 452.320.2, in terms, requires the petitioner (plaintiff) to "satisfy the court of one or more of the following facts:

(a) That the respondent has committed adultery and the petitioner finds it intolerable to live with the respondent;

(b) That the respondent has behaved in such a way that the petitioner cannot reasonably be expected to live with the respondent;

(c) That the respondent has abandoned the petitioner for a continuous period of at least six months preceding the presentation of the petition;

(d) That the parties to the marriage have lived separate and apart by mutual consent for a continuous period of twelve months immediately preceding the filing of the petition;

(e) That the parties to the marriage have lived separate and apart for a continuous period of at least twenty-four months preceding the filing of the petition."

The only one of these states of fact which could possibly be said to exist in this case is that the parties had lived separately and apart for a continuous period of twenty-four months immediately preceding the filing of the petition. The plaintiff's argument that the defendant was guilty of nonsupport takes no account of this court's decision in *Hulse v. Warren*, 777 S.W.2d at 322, which rejects the notion that one spouse is necessarily guilty of nonsupport because he has not denuded himself of assets to furnish necessaries for a spouse possessed of sufficient means to furnish those necessaries for himself or herself. See also 1 H. Clark, *Law of Domestic Relations in the United States* § 7.3, 444-45, 448 (2d ed. 1987). Further, as this court observed in that case, separation necessitated by illness which requires constant care the other spouse cannot reasonably provide is not a "voluntary separation" for the purposes of dissolution actions. *Hulse v. Warren*, 777 S.W.2d at 321. If our ruling was dictum in that case, it was sound dictum and we adopt it as our ruling here.

For the reason indicated, the judgment is reversed.

FLANIGAN, C.J., and SHRUM, J., concur.

---

4. The present version of the Uniform Marriage and Divorce Act, which was amended in 1971 and 1973, appears 9A U.L.A. 156 (1987).